IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAMON DELGADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11-cv-05418 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| DR. PARTHASARATHI GHOSH, DR. ) | |
| CATALINO BAUTISTA, DR. IMHOTEP ) | |
| CARTER, DR. SALEH OBAISI, ) | |
| LATONYA WILLIAMS, B. KERL, ) | |
| KAREN RABIDUAU, MARCUS HARDY, ) | |
| MICHAEL LEMKE, MICHAEL ) | |
| MAGANA, TARRY WILLIAMS, ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| and JOHN OR JANE DOE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ramon Delgado, a prisoner in the custody of the Illinois Department of Corrections being held at the Stateville Correctional Center ("Stateville"), has brought this lawsuit pursuant to 42 U.S.C. § 1983 alleging that the defendants have been deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Delgado has sued several members of Stateville's medical staff—Dr. Parthasarathi Ghosh, LaTonya Williams, Dr. Imhotep Carter, Dr. Catalino Bautista, and Dr. Saleh Obaisi—all of whom were employed by Wexford Health Sources Inc. ("Wexford"). He has also asserted claims against B. Kerl, a Sergeant of Security at Stateville; Karen Rabiduau, a Stateville Placement Officer; and Tarry Williams ("Warden Williams"), who currently holds the position of Warden at Stateville. Finally, Delgado has named as defendants three former Stateville Wardens: Marcus Hardy, who served as Warden from December 2009 to January

2013; Michael Lemke, who served from January 2013 to December 2013; and Michael Magana, who served from December 2013 to March 2014.

Before the Court are three separate motions to dismiss. Lemke, Magana, and Warden Williams, together, and Hardy, individually, have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all of Delgado's claims against them for failure to state a claim. (Dkt. Nos. 128, 151.) In addition, Wexford has filed a motion to dismiss Count V of Delgado's Amended Complaint, which purports to state a claim against Wexford under the doctrine of *respondent superior*. (Dkt. No. 139.) For the reasons explained below, all of the motions are granted. The Court denies Delgado's request that the Court certify for interlocutory appeal, pursuant to 28 U.S.C. § 1292, the question of Wexford's *respondeat superior* liability.

## BACKGROUND

Delgado initially filed this lawsuit against Defendants Hardy, Williams, Ghosh, Kerl, and Rabideau on August 9, 2011. (Dkt. No. 1.) In his initial *pro se* complaint, Delgado alleged that those defendants denied him medical care and treatment in deliberate indifference to serious medical needs caused by an injury to Delgado's left knee that he suffered while playing basketball on August 17, 2009. Delgado filed his Amended Complaint through pro bono counsel on September 21, 2014. (Dkt. No. 113.) The Amended Complaint elaborated on the factual allegations in the original complaint, and also added claims against Defendants Bautista, Carter, Obaisi, Wexford, Hardy, Lemke, Magana, and Warden Williams.

In the relevant portion of the Amended Complaint,[1] Delgado alleges that his injury was a torn meniscus that caused pain, suffering, and damage to his left knee. (First Am. Compl. ("FAC") ¶ 18, Dkt. No. 113.) From the date of his injury, Delgado submitted numerous requests

---
[1] For the purposes of the present motions, the Court accepts as true all well-pleaded allegations set forth in Delgado's Amended Complaint and draws all reasonable inferences in Delgado's favor. *See Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013).

for medical treatment regarding his injuries (the Amended Complaint does not specify to whom he directed these requests), but he did not receive any medical treatment or an examination of any kind until October 15, 2009, when he was examined by Williams, a physician's assistant. (*Id.* ¶¶ 19-20.) Delgado made several visits to Williams, who performed only cursory examinations and offered inadequate treatments. (*Id.* ¶¶ 20-25.) Delgado alleges that he submitted additional requests for treatment beginning in November 2009; again, Delgado does not specify to whom he made those requests. (*Id.* ¶¶ 21, 24.)

On March 17, 2010, Delgado's knees were x-rayed. (*Id.* ¶ 24.) The results of the x-rays showed damage to both of Delgado's knees. (*Id.*) Notwithstanding the x-rays, Delgado did not see a physician until August 16, 2010, one full year after he injured his left knee. (*Id.* ¶ 26.) Ghosh, who served as Medical Director at Stateville, performed the examination and ordered a Magnetic Resonance Imagery ("MRI") for Delgado's left knee. (*Id.*) On or about September 2, 2010, however, Ghosh advised Delgado that the MRI was not going to be performed. (*Id.* ¶ 28.)

Despite his continuing knee issues, Delgado alleges that on November 15, 2010, Kerl caused him to be removed from the Stateville Health Care Unit ("HCU"), where he had been admitted on August 20, 2010. (*Id.* ¶ 27.) Kerl placed Delgado on gallery five, an upper level cell, where Delgado was housed until November 22, 2010. (*Id.*) The upper level cell required him to navigate numerous flights of stairs and further aggravated the condition of his knees. (*Id.*) On December 20, 2010, Placement Officer Rabiduau moved Delgado from the ground floor bunk to an upper gallery, which again required Delgado to navigate numerous flights of stairs and further aggravated the condition of his knees. (*Id.* ¶ 30.)

On December 30, 2010, Delgado finally received an MRI on his left knee, which showed a lateral meniscal tear with adjacent parameniscal cysts and a medial meniscal tear with joint

effusion. (*Id.* ¶ 31.) Despite the MRI results, Delgado was not moved from his upper gallery cell, and as a result he fell down the stairs from gallery 3 to gallery 1 on January 5, 2011. (*Id.* ¶ 33.) Delgado was taken to the HCU for 5 days after this fall, where he again was examined by Ghosh, who confirmed that Delgado had a torn meniscus. (*Id.* ¶¶ 32-33.) Upon being released from the HCU, Delgado was again placed in a cell on an upper level, which would require him regularly to negotiate several flights of stairs, further exacerbating his injury. (*Id.* ¶ 34.) Delgado submitted a grievance on January 10, 2011 asking to be placed in a cell on the ground floor of the gallery, and he was placed in a ground floor cell on or about January 27, 2010. (*Id.* ¶¶ 35-36.)

On or about June 16, 2011, Delgado was seen by the new Medical Director of Stateville, Bautista, who performed a cursory examination of Delgado's knee. During this examination, Buatista learned of Delgado's medical condition, including the results of the MRI, but did not schedule Delgado for surgery and discontinued Delgado's prescription for pain medication. (*Id.* ¶ 38.) During this time period, Carter also became aware of Delgado's knee injury, but did not schedule surgery. (*Id.* ¶ 39.) Sometime after his injury, Delgado had begun to use crutches; Delgado alleges that Carter failed to timely respond to Delgado's request for a renewal of his permit to have crutches and a low bunk, low gallery permit. (*Id.*) As a result of Carter's inaction, Delgado's crutches were confiscated on May 11, 2013, and on two occasions over the next week, Delgado fell down the stairs due to his knee injury. (*Id.* ¶ 40.) After these falls, Delgado's medical permit for crutches was renewed, but he alleges that both falls could have been avoided if his crutches had not been confiscated in the first place. (*Id.*)

On October 29, 2013—over four years after his injury—Delgado was finally approved for arthroscopic partial lateral meniscetomy and chondroplasty to repair his left knee meniscus tears. (*Id.* ¶ 41.) However, as of September 16, 2014 (the date that Delgado filed the Amended

Complaint), Delgado still had not had the surgery. (*Id.* ¶ 43.) At that point, Obaisi acted as Stateville's Medical Director, and Delgado alleges that Obaisi failed to arrange for Delgado to have surgery despite having examined him and knowing that he had been recommended for surgery. (*Id.* ¶ 44.) Delgado also alleges that despite being in constant pain, his medications would regularly run out and it would take multiple requests to Ghosh, Carter, and Bautista before the medications were refilled, leaving Delgado without any pain medications for substantial periods of time. (*Id.* ¶ 45.)

Delgado now brings claims under 42 U.S.C. § 1983 against all of the defendants. In Count IV of his seven-count Amended Complaint, Delgado seeks to hold Wexford liable under a policy and practices theory. In Count V, Delgado seeks to impose liability on Wexford under the doctrine of *respondent superior* for the actions of its employees Ghosh, Williams, Carter, Bautista, and Obaisi. In Count VI, Delgado seeks to hold Hardy, Lemke, Magana, and Warden Williams (all in their individual capacitates) liable for purported deliberate indifference to his knee injuries.

## DISCUSSION

Federal Rule of Civil Procedure 8(a) requires a complaint to contain a short plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). To survive a Rule 12(b)(6) motion, the short plain statement must overcome two hurdles. First, the complaint's factual allegations must be sufficient to give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Second, the complaint must contain sufficient allegations based on more than speculation to state a claim for relief that is plausible on its face. *Id.* This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Id.* (citing *Sanjuan v. Am. Bd. of*

*Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Delgado claims that the defendants violated his constitutional right to be free from cruel and unusual punishment by acting with deliberate indifference to his serious medical needs. Section 1983 creates a cause of action against "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Since a § 1983 action must be brought against a "person," to recover damages under that statute, "a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The doctrine of *respondeat superior* does not apply to actions filed under § 1983. *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008). Rather, to be held liable for the actions or omissions of their subordinates, supervisors "must know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

**I.      Motions to Dismiss Defendants Lemke, Magana, Hardy, and Warden Williams**

Defendants Lemke, Magana, Hardy, and Warden Williams argue that, as non-medical prison officials, they cannot be held liable for Delgado's allegedly inadequate medical care.

6

Generally speaking, "[p]rison directors and wardens are 'entitled to relegate to the prison's medical staff the provision of good medical care.'" *Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012) (quoting *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)). However, the Seventh Circuit has recognized that even when a prisoner is under medical supervision, a prison official may be held liable for deliberate indifference to the prisoner's serious medical needs if that prison official has "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (quoting *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008)). Thus, deliberate indifference claims may proceed against non-medical prison authorities when the pleadings indicate those officials had actual knowledge of improper treatment. *See id.* at 755.

Here, the Amended Complaint does not plead any particularized facts that would indicate that any of the wardens were aware of Delgado's condition. The only allegations in the Amended Complaint pertaining to the former wardens conclusorily state that Defendants Hardy, Lemke, and Magana all "knew of Delgado's injuries, knew that Delgado was not receiving medical care of his medical condition, knew of Delgado's grievances in connection with the failure to provide medical care, knew of the deliberate indifference to Delgado's medical needs and did nothing to remedy the constitutional violations." (FAC ¶¶ 50-52, Dkt. No. 113.) Delgado further alleges that "[e]ach of the Wardens [Hardy, Lemke, Magana, and Williams] knew of Delgado's serious medical condition and the deliberate indifference to which he was subjected and had the duty to prevent the constitutional violations which occurred within their supervision and control." (*Id.* ¶ 106.) But these allegations are too conclusory to state a claim because "[f]or the purposes of a motion to dismiss, a warden cannot be assumed to be directly involved in the prison's day-to-day operations." *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998). Furthermore, although

7

Delgado makes several allegations that he made grievances or complaints regarding his medical treatment, he does not allege that any of these made their way to any of the warden defendants.[2]

Delgado cites a number of cases for the proposition that non-medical prison officials may be held liable for deliberate indifference. However, each of those cases only serves to illustrate the insufficiency of Delgado's pleading here. In *Hoddenback v. Chandler*, No. 11 C 50348, 2013 WL 5785598 (N.D. Ill. Oct. 28, 2013), for example, the court found that the plaintiff stated a claim for deliberate indifference against the Warden of the Dixon Correctional Center where the allegations in the complaint, taken as true, established that she had actual knowledge of a prisoner's torn retina. *Id.* at *2. According to the complaint, the plaintiff submitted to the warden an emergency grievance that described with specificity the conditions from which he was suffering and his request for medical attention, and then wrote a follow-up letter to a grievance officer reiterating his medical concerns and also explaining that he had filed an emergency grievance directly with the warden. *Id.* at *3. The court found that those facts allowed it "to infer that [the warden] had actual knowledge of plaintiff's condition, but failed to take action." *Id.* Similarly, in *Young v. Wexford Health Sources*, No. 10 C 08220, 2012 WL 621358 (N.D. Ill. Feb 14, 2012), the plaintiff alleged that he sent letters to the warden detailing his lack of treatment for chronic pancreatitis and that the warden ignored those letters. *Id.* at *2. The plaintiff further alleged that the warden personally denied two emergency medical grievances filed by the

---

[2] Some decisions from this District have found that even allegations that a grievance made its way to a warden are not sufficient to state a deliberate indifference claim against that official. *See Brown v. Wexford Health Sources*, No. 13 C 4419, 2014 WL 257552, at *3 (N.D. Ill. Jan. 23, 2014) (complaint alleging deliberate indifference could not go forward against warden where sole allegation was that he refused to consider two emergency grievances describing a twisted back and neck as emergencies); *Neely v. Randle*, No. 12 C 2231, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) (complaint did not state claim for deliberate indifference against warden because it "allege[d] no actual involvement by the wardens in [plaintiff's] medical care other than by dealing with, or allegedly ignoring, [plaintiff's] grievances" regarding an abscessed tooth). This Court need not decide that issue here, as Delgado has made no such allegation.

plaintiff. *Id.* Based on those allegations, the court denied the warden's motion to dismiss. *Id.* at *4.

Delgado, unlike the plaintiffs in *Young* and *Hoddenback*, has not alleged any facts that would allow the Court to plausibly infer that Defendants Hardy, Magana, Warden Williams, and Lemke had any knowledge of Delgado's medical situation. Accordingly, the Court grants their motions to dismiss.

## II. Defendant Wexford's Motion to Dismiss

Wexford moves to dismiss Count V, which seeks to hold the company responsible for the actions and omissions of its employees under the doctrine of *respondeat superior*. In analyzing a § 1983 claim against a private corporation, such as Wexford, the Court applies the same principles as for claims against a municipality. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). Therefore, an inmate bringing a claim against a corporation for an alleged violation of his constitutional rights must show that the corporation supports a "policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Estate of Novack ex rel. v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)). Because a § 1983 claim may not be premised upon a theory of vicarious liability, the corporate policy "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Id.* (quoting *Novack*, 226 F.3d at 530).

It has long been settled law that, as with § 1983 cases against state actors, there is no *respondeat superior* liability for § 1983 actions against private corporations. *See, e.g., Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Recently, however, the Seventh Circuit expressed doubts regarding the wisdom of this rule. In *Shields v. Illinois Department of*

9

*Corrections*, 746 F.3d 782 (7th Cir. 2014), the Seventh Circuit considered a claim invoking the doctrine of *respondeat superior* against Wexford brought by an inmate who ruptured tendons in his shoulder while lifting weights and did not receive prompt medical attention. *Id.* at 786-88. The plaintiff sued a number of defendants, including Wexford. The district court granted summary judgment in favor of Wexford and two of its employee defendants because, among other things, the plaintiff could not identify who was responsible for treating him in a timely manner.

On appeal, the Seventh Circuit discussed the history of § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which held that a local government could be sued as a person under § 1983 but that "*respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees." *Id.* at 663 n.7. The *Shields* court noted that the Seventh Circuit—and every other Circuit to have considered the issue—has applied this standard to private corporations, but nonetheless questioned the logic of extending *Monell* to shield private corporations from vicarious liability in § 1983 cases. *Shields*, 746 F.3d at 790-93. The court further observed that Supreme Court decisions since *Monell* have distinguished between employees of municipalities and employees of private corporations, which suggests that courts "should not foreclose *respondeat superior* liability against private corporations under § 1983." *Id.* at 793-94 (citing *Richardson v. McKnight*, 521 U.S. 399, 412 (1997); *Wyatt v. Cole*, 504 U.S. 158, 167–68 (1992)). Finally, the *Shields* court discussed the real world ramifications of applying *Monell* to private corporations such as Wexford:

> Private prison employees and prison medical providers have frequent opportunities, through their positions, to violate inmates' constitutional rights. It is also generally cheaper to provide substandard care than it is to provide adequate care. Private prisons and prison medical providers are subject to market pressures. Their employees have financial incentives to save money at the expense of inmates' well-being and constitutional rights. The unavailability of qualified

>immunity for these employees is a deterrent against such conduct, but *respondeat superior* liability for the [private] employer itself is likely to be more effective at deterring such actions. Insulating private corporations from *respondeat superior* liability significantly reduces their incentives to control their employees' tortious behavior and to ensure respect for prisoners' rights. The results of the current legal approach are increased profits for the corporation and substandard services for both prisoners and the public.

*Id.* at 794.

Notwithstanding its reservations, however, the *Shields* court ultimately concluded that "[t]he answer under controlling precedent . . . is clear." *Id*. at 789. Following what it described as "a unified phalanx of decisions from our own and other circuits,*"* the Seventh Circuit expressly held that "*[r]espondeat superior* liability does not apply to private corporations under § 1983." *Id.* In light of this recent, explicit reaffirmation that *Monell* applies to private corporations, this Court must dismiss Count V of Delgado's Amended Complaint.

In his response brief, Delgado urges that if the Court dismisses Count V, it should certify the issue of Wexford's *respondeat superior* liability for interlocutory appeal. Under 28 U.S.C. § 1292(b), the Court may find that an interlocutory appeal is warranted if the order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and where "an immediate appeal from the order may materially advance the ultimate termination of the litigation." But while sharing the concerns discussed in *Shields*, this Court must also recognize that the law of this Circuit remains settled after that decision. Presented with an opportunity to reconsider the state of the law less than two years ago, the Seventh Circuit declined to do so.[3] Thus, this Court cannot find that there is a "substantial ground for difference

---

[3] Notably, in the *Shields* opinion that was actually issued on March 12, 2014, the panel openly acknowledged that it had considered preparing an opinion explicitly overruling prior precedent for circulation to the entire court under Circuit Rule 40(e). As the parties had not briefed the issue of whether *Iskander* and similar cases should be overruled, however, the panel instead opted to stand on current precedent and invite a petition for rehearing *en banc*, which would allow both sides to be fully heard.

11

of opinion" on the issue of Wexford's *respondeat superior* liability for a § 1983 claim that would warrant certifying the matter for interlocutory appeal. *See* 28 U.S.C. § 1292(b).

Moreover, the Court is not convinced that this issue represents a controlling issue of law. A question of law is considered controlling when "its resolution is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 658 (7th Cir. 1996). Here, litigation is likely to proceed in more or less the same manner regardless of whether Wexford can be held liable under a theory of *respondeat superior*—even with Count V dismissed, Delgado may proceed against Wexford under his practices and policies theory in Count IV. Furthermore, it is doubtful that certifying the issue of Wexford's vicarious liability for immediate appeal will materially advance the ultimate resolution of this lawsuit. Even without considering Hardy, Lemke, Magana, and Warden Williams (all of whom might yet be named in a second amended complaint), there remain nine defendants in this case. This case will proceed on the merits regardless of Wexford's presence as a defendant, and it seems very likely that one or more additional issues for appeal may emerge. Under the circumstances, this Court cannot find that an interlocutory appeal—and the accompanying spectre of multiple, successive appeals of the same matter—would be a prudent use of judicial resources or materially advance resolution of Delgado's claims.

---

*Shields*, 746 F.3d at 795-96. The plaintiff's request for rehearing *en banc* was subsequently denied on May 16, 2014.

**CONCLUSION**

For the foregoing reasons, the motions to dismiss filed by Hardy (Dkt. No. 128) and Magana, Warden Williams, and Lemke (Dkt. No. 152) are granted. Those claims are dismissed without prejudice. Delgado may seek leave to file an amended complaint that articulates facts sufficient to state a claim against Hardy, Magana, Lemke, or Warden Williams, if he is able to do so consistent with the requirements of Federal Rule of Civil Procedure 11. Wexford's motion to dismiss (Dkt. No. 139) is also granted; Count V of the Amended Complaint is dismissed with prejudice. The Court declines to certify the issue of Wexford's *respondeat superior* liability for interlocutory appeal.

ENTERED:

Dated: January 27, 2016

Andrea R. Wood
United States District Judge